## In re Emmanuel B. AWUKU, Debtor.

### No. 899–86739–288.

United States Bankruptcy Court,
E.D. New York.

April 28, 2000.

---

Michael D. Hess, M. Diane Jasinski, Office of the Corporation Counsel of the City of New York.

Michael J. Macco, trustee, Huntington, NY.

Sheldon Barasch, Monika Mazurczyk, DC–37 Municipal Employees Legal Services Plan, New York City, for Debtors.

## MEMORANDUM OF DECISION DENYING DEBTOR'S MOTION FOR AN ORDER SUSPENDING HIS PENSION CONTRIBUTIONS

STAN BERNSTEIN, Bankruptcy Judge.

### Issue:

The dispositive issue of law before the Court is whether a bi-weekly deduction equal to 3% of the chapter 13 debtor's gross salary, which is credited to his pension plan, can be treated as a "reasonably necessary" expense in calculating "disposable income" under 11 U.S.C. section 1325(b)(2)(A)?

### Background:

On August 11, 1999, the debtor filed a petition for relief under chapter 13 of the Bankruptcy Code. He has worked as a tax auditor for the Department of Finance of New York City for more than twenty years. His annual salary is $57,500. As a condition of his employment, he is also a member of the New York City Employees' Retirement System (NYCERS), which administers the tax-qualified "public multi-employer pension plan."

The debtor's employer, the City of New York, deducts 3% of his pro-rated gross income from his bi-weekly pay check. This deduction is $65.59. Absent bankruptcy, these bi-weekly deductions are automatically transferred to the plan administrator of the New York City Employees' Retirement System (NYCERS) and credited to the debtor's pension account. In the formal terminology of tax-qualified pension and profit-sharing plans, which is governed by the federal Employee Retirement Income Security Act of 1974 (ERISA), the NYCERS plan is a "defined benefit plan" under which the participating member upon his retirement receives a scheduled amount, i.e., a defined benefit, provided that until the date of retirement, he or she has satisfied his or her obligations to NYCERS.

The debtor's schedules of liabilities lists $67,000 in unsecured claims owing primarily to consumer credit card issuers, some of which were earlier reduced to judgment. When the judgment creditors began to enforce their execution remedies under the state law of New York, the debtor filed for relief from this Court. With one exception, each of the debtor's non priority unsecured creditors filed proofs of claim, which total around $75,000. The debtor also scheduled a contested and contingent unsecured claim of $10,000,000 in alleged damages arising from a pending personal injury action filed against him in the state courts. (There is also a *de minimis* prior-

ity claim for unpaid water and sewer charges.) He is apparently current with the first mortgagee on his single-family residence.

Under his amended plan, the debtor proposes to continuing paying the first mortgagee directly, to satisfy the water and sewer charge in full, and to pay a minimum of 10% of the allowed unsecured claims or $7,500 in total. With respect to the pending personal injury claim, the plan proposes to limit the plaintiffs to a recovery under his insurance policy. To fund his plan, he has pledged all of his "disposable income" toward the allowed claims of his creditors for a period of thirty-six months. In his original Schedules I (Monthly Income) and J (Monthly Expenses), he has $293 a month as excess or "disposable" income to fund his plan payments.

After deducting the trustee's surcharge of 10% for monies collected and disbursed to creditors, the non priority unsecured creditors with allowed claims in this estate would receive a 13% distribution over a thirty-six month period.

At the meeting of creditors, the trustee "advised" the debtor and his counsel that since the budget included bi-weekly deductions of $83.97 for the repayment of a pension loan and an additional $65.59 for contributions to his pension plan, he would oppose confirmation of the debtor's original plan on the ground that these two deductions were not "reasonably necessary" expenses for the current support of the debtor and his dependents. The thrust of the oral objection was that the debtor had improperly reduced his "disposable income" by including the pension plan deduction to NYCERS. The debtor could render this objection moot by causing these bi-weekly deductions to be suspended for the life of the plan. The direct result would be that the debtor's disposable income would be increased, with the concomitant dollar-for-dollar increase in the distributions to unsecured creditors.

To moot the trustee's objection concerning repayment of his pension loan, the debtor entered into a stipulation with NYCERS to suspend the repayment of the outstanding pension loan during the pendency of his three year chapter 13 plan. As an uncontested matter, that stipulation was routinely approved by order of this Court. This made the distribution to nonpriority unsecured creditors approximately 20%.

NYCERS would not, however, agree to suspend the bi-weekly "mandatory payments" of $65.59, which represents 3% of the debtor's pro-rated annual gross salary. The debtor, thus, found himself caught in the cross-fire between the trustee's remaining objection to confirmation and NYCERS' opposition to suspending the remaining bi-weekly deduction. In response, the debtor's counsel filed an affirmation for an order suspending the "mandatory payments" to the pension plan. If this relief were granted, it would raise the prorata distribution to non priority unsecured creditors to 23%.

From the debtor's perspective, he has no control over the deduction payable to NYCERS, and at the same time, he has already committed all of his disposable income to the plan. He has no uncommitted dollars to pay the deduction to NYCERS and to pay the trustee that same amount a second time. The harsh logic of the trustee's objection is that if the debtor does not somehow make up the imputed loss to creditors arising from an alleged improper deduction in computing disposable income, then the debtor cannot receive any relief under chapter 13. Pushed into a corner by the trustee, the debtor is forced to seek extraordinary relief from this Court in the form of an order, in effect, enjoining NYCERS from continuing the mandatory deduction under applicable state law.

At the hearing in response to the Court's inquiry, the Plan Administrator of NYCERS acknowledged that he was apprehensive that he might jeopardize the

tax-qualified status of the various plans administered by him, were he to consent to a suspension of the debtor's contributions for the duration of the plan. Secondly, the Plan Administrator was also concerned about the administrative nightmare that would be caused if he had to track suspension orders for thousands of covered employees for the three to five years of their respective chapter 13 plans that could be confirmed over the next few years in the Eastern and Southern Districts of New York.

Upon reviewing the debtor's schedules and statement of affairs, amended plan, history of making interim plan payments timely, the pleadings and memoranda filed in this case, and the representations and arguments of counsel, the Court denied the debtor's motion in open court but reserved the opportunity to issue an opinion consistent with that ruling.

Discussion.

This issue has to be framed by its institutional context. As of June 30, 1999, the debtor was one of 313,000 active members and 239,000 retirees and beneficiaries in the five New York City pension plans (NYCERS, the Board of Education, Teachers, the Police Department and the Fire Department.) NYCERS itself has 217,016 members and 128,101 retirees and beneficiaries. The debtor's counsel, the standing chapter 13 trustee, and Corporation Counsel for the City of New York recognize the potential impact of the determination of this issue on the routine administration of the NYCERS' plan. Despite their different interests in the outcome, each approaches this as a "portfolio" issue, one which affects the hundreds of NYCERS members who file chapter 13 cases annually in this district and in adjacent districts as well as their beneficiaries.

The magnitude of the number of potentially affected members and beneficiaries is surely sufficient cause for this Court to tread very carefully in this domain. Although every chapter 13 case has to be treated upon the basis of its distinctive facts, a pragmatic judge must consider the impact of a decision in a particular case raised by a significant portfolio issue. The tension between "doing justice" in the individual case and at the same time considering the impact of a decision on readily identifiable institutions is difficult to resolve. This is especially so because traditionally common law judges embraced the theory that justice in individual cases leads in the long run to highly calibrated rules and standards, and that is contrary to this tradition to look much beyond the particular case. Those of us who came to law after years of professional training in the social or policy sciences struggle to reconcile the traditional common law approach with the systemic perspective of our earlier studies. The Chief Judge of the Seventh Circuit, the Honorable Richard A. Posner, is the most insistent voice in calling for a pragmatic jurisprudence that requires judges in rendering their decisions to give sufficient weight to the perspectives of the social sciences, especially modern welfare economics. See his *Problematics in Moral and Legal Theory* (Cambridge, MA: Harvard Univ. Pr.1999), esp. ch. 4, "Pragmatics."

In this case, this Court, acting in the common law tradition, could simply hold that, based upon the debtor's cash flow, statement of affairs, and schedules, the amount of the debtor's biweekly deduction of $65.59 paid to NYCERS must be viewed, in the scheme of things, as falling well within the parameters of "reasonably necessary expenses." See *Smith v. Spurgeon (In re Smith)*, 207 B.R. 888, 890 (9th Cir. BAP 1996); *In re Mills*, 246 B.R. 395 (Bankr.S.D.Cal.2000). This is, at bottom, a nominalist approach, with no effort made to rationalize the holding under any positive or normative theory of "household economics." In reviewing chapter 13 budgets, the bankruptcy courts have long and consistently held that they have to be fairly tolerant of modest levels of variance in the basic budget categories such as food,

clothing, rent or mortgage payments, uninsured medical and dental expenses, transportation expenses, and health, life, property and casualty insurance. Beyond these basic budget categories, debtors are also entitled to include a modest level of discretionary expenditures for recreation, publications, family entertainment, contingencies, and the like. *See, e.g., In re Esquivel,* 239 B.R. 146 (Bankr.E.D.Mich. 1999) (collecting cases on discretionary expenditures).

■ The *rule of reason,* implicated in determining what is a "reasonably necessary expense," must itself be applied by the bankruptcy court, acting with a measured sense of tolerance and self-restraint. This is especially so when Congress has seen fit and proper under a 1998 amendment to section 1325(b)(2)(A) to permit a debtor to deduct up to 15% from his or her income in order to make charitable contributions to "a qualified religious or charitable entity or organization." Against this recent amendment, a 3% deduction for the purpose of the debtor's income retirement security is *de minimis* in comparison.

In fairness to the chapter 13 trustee, he finds himself under a duty to object to confirmation of the debtor's proposed plan, based upon two recently reported decisions by bankruptcy judges in this Circuit in which the parties have been NYCERS and the same pre-paid legal services firm representing City employees. *See In re Jaiyesimi,* 236 B.R. 145, 149 (Bankr. S.D.N.Y.1999) and *In re Nation,* 236 B.R. 150 (Bankr.S.D.N.Y.1999). As he candidly stated on the record during the hearing, the chapter 13 trustee simply needs to know exactly where this Court comes out on this issue so that he can manage his assigned cases efficiently and consistently. As for the debtor's counsel, it is intent upon litigating this issue until a definitive

ruling is made by the Court of Appeals for the Second Circuit.

## A. Mandatory Payments to NYCERS.

NYCERS, represented by the Corporation Counsel's Office, contends that **the bi-weekly deductions are not voluntary payments** by the debtor, **but mandatory payments that are a "condition" to his employment.** Relying primarily upon the recent decision of *In re Davis,* 241 B.R. 704 (Bankr.D.Mont.1999), NYCERS further contends that mandatory payments are, by definition, "reasonably necessary" expenses.[1] Those deductions are properly "above the line" in calculating the debtor's disposable income; therefore, there is no necessity as a matter of bankruptcy law to grant the debtor's motion. Moreover, if the deductions could be suspended, which NYCERS asserts is not possible under applicable New York state law and the provisions of the City's Administrative Code, then the debtor would be materially prejudiced in several respects. First, the debtor will be denied the accumulation of "service credits" that result in annual pay increases for the three years during which the debtor is performing under his confirmed chapter 13 plan. The two conditions for accumulating service credits are continued employment and payment of deductions to NYCERS. Second, at the end of the plan, the debtor will be liable to pay the entire amount of the suspended payments, plus accrued interest, and those payments will have to be made in "after-tax" dollars, rather than in the "tax-deferred" dollars a member enjoys as a contributing member of NYCERS. This is, in large measure, a "counter-factual" hypothesis because no member in the plan can suspend his deductions; moreover, NYCERS is anxious that if this Court were to impose suspension in this (and presumably similar cases), that could prejudice the tax-

---

1. The *Davis* Court explicitly repudiated the pre-emption rationale of *In re Nation, supra.* In its Memorandum filed with this Court, NYCERS concedes that it innocently misled the *Jaiyesimi* Court when it had represented that the debtor would not suffer any prejudice to his service credits. A plain reading of the opinion in *Jaiyesimi* discloses that the "lack of prejudice" was a substantial reason in support of the decision.

qualified status of the public multi-employer plan to the prejudice of thousands of members and their beneficiaries.

To support its contention that the bi-weekly deductions are both "mandatory payments" and a "condition of employment," NYCERS cites the applicable provisions of the New York Retirement and Social Security Law ("RSSL") and the New York City Administrative Code. Under RSSL, all persons who, on or after July 1, 1976, are employed by a public employer which participates on behalf of its employees in NYCERS:

shall be required to become members ... in such retirement or pension fund in the manner provided for by the relevant provisions of the New York City administrative code and other relevant laws and rules and regulations.

N.Y. Retire. & Soc. Sec. Law section 600(b)(1) (McKinney 1999).

In turn, Section 13–104 of the New York City Administrative Code provides that mandatory membership shall consist of:

2. All persons in city-service, ... in positions in the competitive or labor class of the civil service, who en-tered (sic) or reentered such service after the first day of October, nineteen hundred twenty, ...

N.Y.C. Admin. Code section 13–104(1).

█ NYCERS represents to the Court that the debtor, as an employee in "city-service" who holds a competitive position in the City's Finance Department, is required to become a member of NYCERS. NYCERS further represents that there is no provision under RSSL permitting withdrawal from NYCERS. In this critical respect, Debtor's continuing membership is both mandatory and a condition of continued employment. *See Morrissey v. New York State Employees' Retirement System*, 298 N.Y. 442, 84 N.E.2d 627 (1949).

NYCERS further represents that individuals who join NYCERS after July 1, 1976 are subject to the provisions of Arti-cle 15 of RSSL (N.Y. Retire. & Soc. Sec. Law section 600 *et. seq.*), esp. section 613. Membership contributions:

(a). Members shall contribute three percent of annual wages to the retirement system in which they shall have membership ...

N.Y. Retire. & Soc. Sec. Law section 613(a) (McKinney 1999).

Under section 613(d), the City, as the public employer, must comply with the statutory directive to implement the 3% per annum deduction from the member's salary for remitting to NYCERS.

*Jaiyesimi* found that for purposes of deciding the dispositive issue of "disposable income," the debtor has to prove that his employment will, in fact, be terminated, if his biweekly deductions to NYCERS were suspended. If that adverse outcome will not occur, then the debtor cannot describe the deduction as a "mandatory payment." (By inference, the deduction would be deemed a "voluntary payment," which according to the precedents cited with approval by the *Jaiyesimi* Court hold are not properly deductible in computing disposable income.)

In a similar fact situation, the bankruptcy court in *In re Tibbs*, 242 B.R. 511 (Bankr.N.D.Ala.1999) granted a motion to suspend the payments to a public school teacher's pension plan to relieve the debtor from having to make a Hobson's choice: (i) to resign as a public school teacher so that the debtor would no longer have to make payments to her pension plan, or (ii) to dismiss her chapter 13 petition because she could not overcome the standing chapter 13 trustee's objection to confirmation of her plan.

█ This Court is not persuaded that a chapter 13 debtor has to prove that his or her job will be terminated in order to exclude the "mandatory payments" from the computation of disposable income. It ought to be sufficient that the debtor can prove that materially adverse conse-

quences will flow from any suspension of the debtor's deductions credited toward a tax-qualified pension plan. In this particular case, the parties agree that suspension of the mandatory payments will be materially prejudicial to the debtor and his beneficiaries. Perhaps with this said, the Court could hold that as a matter of construction of chapter 13 as a whole, Congress could not have intended to deny chapter 13 relief to debtors who are public employees unless they were willing to compromise their interests in their respective pension plans. As one ground for denying the debtor's motion, this Court is prepared to rule that "good faith" and each of the other criteria for confirmation do not require that the debtor exclude "mandatory payments" to a tax-qualified defined benefit multi-public employer plan from disposable income. To rule in this manner would be the most judicially conservative step to take because it recognizes "mandatory payments" to plans of this character as supported by a series of reported decisions by other bankruptcy judges.

B.   Implied Discrimination against Debtors who are not Public Employees.

This Court appreciates the thrust of the criticism that could be raised if it appeared that this opinion is intended to be some sort of approval of preferential treatment in favor of public employees. As a constitutional matter, one partial response is that the State of New York has drawn a rational distinction between public and private employees by mandating payments to NYCERS and similarly situated public employee pension plans. It is not appropriate for this Court to invalidate or impair the operation of this state legislative program on the premise that it is somehow "unfair" that private employees in the State of New York under non-public employer plans are not extended the same sort of recognition as the public employees

have been given. Any federal or state judicial officer can easily justify this difference in treatment as a legislatively recognized and empirically-grounded incentive to qualified persons to induce them to accept offers of employment for public agencies and departments, and to continue to remain in those positions until retirement. Benefit packages are rather customary methods for recruiting qualified personnel.

C.   The Voluntary/Mandatory Distinction.

As noted, several bankruptcy courts have predicated their opinions on the common ground that the payments at issue are "mandatory," rather than voluntary. This Court is, however, not completely persuaded that this is a distinction that makes a dispositive difference. The Court is aware that several bankruptcy judges had already held that voluntary payments to a tax-qualified pension fund were not properly included within the expense column for calculating disposable income. Thus, a bankruptcy judge with a desire to protect at least one rather numerous class of debtors who were making "mandatory payments" to tax-qualified pension plans could concede the validity of the "voluntary contribution" cases, and distinguish this second class of cases as excepted from the precedential effect of the earlier line of authority. Unfortunately, drawing this distinction tends to lead the bankruptcy courts in the direction of perhaps overstating the salience of various characteristics of the "mandatory payment" programs. As a matter of judicial prudence, saving half-a-loaf does have its attractive side. But at bottom, if the distinction is not sound, then continued reliance upon it runs the risk of distorting the correct analysis, and endangering that temporarily saved half-a-loaf.[2]

If the bankruptcy courts are willing to revisit this issue, they may have to re-examine the proposition that a voluntary

2.   This is an essential point in the *Nation* opinion; this Court agrees with the point, but draws different inferences from it.

contribution is, by definition, not properly included as a valid budget item in calculating disposable income. When one re-reads the opinions on "voluntary contributions," one is immediately struck with the seemingly ineluctable force of a moralistic metaphor that absolutely dominates the discussion: "a debtor should not be permitted to invest in his postpetition future at the cost of his prepetition creditors." It derives from a Biblical injunction to be "just before being generous" (especially to oneself).

■ In this respect, the time frame for analyzing "reasonably necessary expenses for the debtor and the debtor's dependents" is severely restricted to immediate needs for food, clothing, shelter, transportation and other "simple bare necessities of life." [3] It is not at all clear to this Court that the construction of what is a "reasonably necessary expense" has to be limited to "present needs." What is "reasonably necessary" is obviously not self-defining, but its phrasing is quite plain. Under the stem canon of construction that restrains judges from resorting to legislative history when the phrasing of a statute is not ambiguous, perhaps one should not examine the legislative history to this term. That seems to be a restraint that often frustrates a comprehensive analysis. As a matter of elementary linguistics and the philosophy of language, the meaning of a word always has to be understood within the context of its use. Often one source that may offer insight into the context in which a statutory term is used is to examine the legislative history. While that legislative history may not be dispositive, it is a source that should at least be considered. See generally Lawrence M. Solan, *The Language of Judges* (University of Chicago Press, 1993).

■ In determining what is a reasonably necessary expense, Congress could have not been clearer in stating its unmistakable intention that the bankruptcy judges have authority to exercise their sound discretion in applying a very broad and open-ended standard. This is because Congress fully understood that this standard could not be readily reduced to tightly bound and mutually exclusive categories. Adopting the thoughtful position of Aristotle, Congress recognized the essence of practical judgment is that it cannot be reduced to overly refined and rigid distinctions that transcend the very nature of the subject in question. When this position is ignored, it usually leads to the fallacy of "misplaced concreteness." Consider, if one will, the sustained criticism of means-testing based upon the gruel-stand imposed by the IRS collectors of delinquent taxes.

■ Even if one were tempted to peer behind the screen, one would not find much to rummage through in the legislative history. Congress may be said to have continued to embrace the prior line of long-standing authority that excluded expenditures for luxury items or excessive expenditures on otherwise basic necessities from a chapter 13 debtor's budget. But those cases are singularly unhelpful in responding to the inherent open-endedness in the term "reasonably necessary." Since this is the case, then there is no authoritative basis for any court to hold that "reasonably necessary expenses" must be limited to current expenditure patterns.

■ There are a fairly wide variety of expenses that are incurred to meet future needs. Presumably any expenses incurred by a debtor to educate his or her children are justified on the need to equip those children with the fundamental skills that are "reasonably necessary" for future employment or, if it not completely passe, for leading an "examined life" or at least playing an active role as an informed citizen in a free and democratic society. The same can be said for expenses incurred for proper medical and dental care so that the debtor and the debtor's dependents will

---

**3.** As sung in raspy voice of the late Phil Harris.

enjoy good health in the future, for maintaining various policies of insurance against future hazards, and so on. Finally, in this day and age, it is "reasonably necessary" throughout a debtor's entire employment history to contribute to a tax-qualified plan to supplement social security benefits. With the "miracles" of modern medicine, the life expectancy of the average American citizen continues to increase. There can be no legitimate dispute that social security benefits will be radically insufficient to meet the basic needs of our population in their retirement years.

When approaching these questions of what is "reasonably necessary," bankruptcy judges must respond to the "felt necessities" of their times. In the face of an ever strong commitment by the federal and state governments to encourage tax-qualified retirement plans in a myriad of ways, it simply defies the general public will for bankruptcy judges to frustrate modest budget outlays for these types of plans. The debtor in this case, as in so many other comparable cases filed by New York City employees who live on Long Island, were contributing to these plans long before they incurred the debts which are treated under their chapter 13 plans. Credit card issuers in this large metropolitan region should have realized that these "mandatory payment" arrangements were in place and would continue to be in place. It ill-behooves their representative, the chapter 13 trustee, now to object that the debtors should not be permitted to continue these very modest levels of contributions to secure their future retirement. If it were the case, as it is not, that a debtor substantially increased his or her level of funding of a pension plan on the eve of filing for chapter 13 relief, then the trustee might have a more compelling objection. But the continued maintenance of the status quo with respect to modest levels of contributions to tax-qualified plans does not offend any of the fundamental principles or norms undergirding the Bankruptcy Code.

This important point is necessarily framed in quantitative terms. The bi-weekly payments to NYCERS for employees in Tier 4 is a straight 3% of gross annual income. In this case, this adds up to no more than $65 every two weeks. That is a reasonably necessary level of expenditure on any objective assessment for a person earning less than $60,000 a year. If it were 20% of $100,000 in annual salary, it would justify closer scrutiny. Inevitably, a court has to make its determination in light of the totality of the circumstances, which include as a crucial component the informed social norms in twenty-first century America. To say that 3% of a lower middle-class annual salary is a "reasonably necessary" expense to secure an adequate retirement income is not legitimately subject to derisive dismissal on the theory that this is a wholly subjective preference of a single bankruptcy judge. While there may be no objective truths in our relativistic age, a judicial decision in this specific context must embrace the dominant normative structure in this society and be prudent in assessing the practical reality of our demographics and our national political commitments. If this Court deliberately ignored those norms and commitments, and imposed its own idiosyncratic preferences then it could stand accused of resolving all contested matters against the length of the chancellor's foot. But to avoid making a decision for fear of appearing "subjective" is to abdicate one's judicial duty. In the end, all that matters is whether a bankruptcy judge can convince his or her peers (and the appellate courts) that "reasonably necessary expenses" must include modest levels of continuing contribution to tax-qualified plans.

D. Federalism.

This Court always begins its analysis of issues raised in this case acutely aware that it is the duty of a specialist federal court of limited jurisdiction to respect the fundamental principles of co-op-

erative federalism that are the foundation of our constitutional regime. As a court solely responsible for administering one federal statute, the Bankruptcy Reform Act of 1979, as amended (the Code), a bankruptcy judge has to resist the temptation to resolve the construction of contested provisions of the Code in order to maximize the norms and values embedded in this single statute.

The least harm to the specific state statutory provisions cited by NYCERS is to respect the debtor's rights and duties as a member of NYCERS by construing the Bankruptcy Code in such a manner as to avoid creating an unnecessary conflict in our cherished complex, inextricably entwined, and delicate federal system.[4] The late Morton Grodzins, a distinguished professor of political science at the University of Chicago a leading scholar on federalism in American government, captured it best when he rejected the image of our federal system as a layered cake, with the states on the bottom layer, and the national government on the top layer, but conceived of our federal system as a marble cake in which the light and dark layers are swirled all about. To avoid impairing or subordinating the regulatory structure of NYCERS under New York state law to a single section of the Bankruptcy Code, this Court need only construe the concept of reasonably necessary expense as including mandatory payments to NYCERS, as NYCERS has urged.

E.  The Role of Pension Plans in Contemporary American Life.

There is also a compelling social and economic logic in holding that a 3% contribution of the debtor's gross annual income is, independent of the question whether the deductions under New York state law are "mandatory payments," a "reasonably necessary expense." Whenever we as federal bankruptcy judges have to construe a basic concept under the Bankruptcy Code, which Congress has deliberately chosen not to define, our pragmatic decisions must reflect the prevailing norms and values of twenty-first century American life. Out of the Great Depression came the idea of our parents' generation that our society must protect working men and women with sufficient income to meet their financial needs upon their retirement. As we come to understand social security, it is not now intended to be the principal source of retirement income. That function is assigned to retirement plans, comprehensibly embodied in the most significant federal legislation of our generation, the Employee Retirement Income Security Act (ERISA). We need not exaggerate the concern, voiced by our responsible national leadership, that if Congress does not respond effectively in the next few years, our children's generation will inherit an insolvent social security system. But it is enough of a concern to recognize that comprehensive legislative programs such as NYCERS, which protect hundreds of thousands of currently employed city employees, retirees, their dependents, and beneficiaries deserve the full respect of the federal bankruptcy courts, and that we should do as little as possible to disturb or impair those critical pension plans.

This Court cannot over emphasize the critical importance for every American adult to invest prudently in his or her retirement income for the duration of his or her entire working life. Although it is undoubtedly to the advantage of this debtor's unsecured creditors for him to pay them the equivalent of the amounts he will be contributing to his pension fund over the next three years, he does not have the additional resources to accomplish that result. To hold as some courts have that the concept of "reasonably necessary" ex-

---

4.  Cf. *In re Nation, supra* in which the Court held that mandatory payments to NYCERS were subject and subordinate under the doctrine of federal pre-emption to section 1325(b)(1)(B). As noted above, another court rejected the pre-exemption analysis in *Nation,* see *In re Davis,* 241 B.R. at 707–709 (Bankr. D.Mont.1999).

penses only extends to current daily needs is both unrealistic and, frankly, short-sighted under the true conditions of economic life in the United States. There is absolutely no support in the legislative history to either chapter 13 as a whole or to section 1325 more specifically to warrant a *per se* rule that treats modest contributions to a pension plan as discretionary expenditures for "luxury" items. The only line of discrimination in that legislative history is drawn between ordinary expenses in supporting a debtor and his dependents vs. extraordinary expenses for luxuries or other unduly high amounts for normal budget categories. Prudent planning for retirement cannot be subject to *per se* rules on the theory that a debtor may only consider current expenses—if that were the case, then deductions to pay premiums for group life insurance; deductions for social security and medicare, deductions for union dues would all be subject to attack as unnecessary expenses. It would be terribly ironic if the message sent to chapter 13 debtors by the courts is that the only expenses that count are for current needs. For it is these debtors who more than anything else need reinforcement for the idea that anticipating future needs is the key to successful financial rehabilitation.[5]

The Bankruptcy Court for the District of Puerto Rico had it exactly right ten years ago when it wrote in a very succinct opinion that a 3% deduction, based upon the annual income of a school teacher, is "not a significant or substantial amount extracted from Debtor's payroll. [citing Collier on Bankruptcy]. The deduction fulfills a public policy enunciated by the Legislature of the Commonwealth of Puerto Rico which this Bankruptcy Court will respect and uphold." *In re Colon Vazquez*, 111 B.R. 19, 20 (Bankr.D.Puerto Rico 1990). The same holds true for the State of New York and NYCERS. *See also, In re Mills*, 246 B.R. 395 (Bankr. S.D.Cal.2000) (Rejecting any *per se* rule and determining that a voluntary contribution to a 401(k) plan was reasonably necessary under the relevant facts of the case.).

### Disposition.

The debtor's motion must be denied for the reasons set forth in this opinion. The debtor shall submit a further amended plan and amended schedules I and J consistent with this ruling within two weeks. Confirmation of the further amended plan will be returned to the June 1, 2000 confirmation calendar at 12:00 p.m.

SO ORDERED.

---

**5.** Does it not border on the oxymoronic for a court to acknowledge that a modest level of contribution to a tax-qualified pension plan is a prudent expenditure, and then in the next breath say that it is not "reasonably neces- sary" for the debtor and the debtor's dependents? To do what is prudent is to do what is reasonably necessary. How can it be any other way?