**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: DAVID C. WELSH AND
SHARON N. WELSH,

*Debtors*,

ROBERT G. DRUMMOND, Chapter 13
Trustee,

*Appellant*,

v.

DAVID C. WELSH and SHARON N.
WELSH,

*Appellees*.

No. 12-60009

BAP No.
10-1465

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Perris, Pappas, and Hollowell, Bankruptcy Judges,
Presiding

Argued and Submitted
November 8, 2012—Portland, Oregon

Filed March 25, 2013

Before: Kenneth F. Ripple,[*] Stephen S. Trott,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Ripple

---

## SUMMARY[**]

### Bankruptcy

The panel affirmed the judgment of the Bankruptcy Appellate Panel, which affirmed the bankruptcy court's judgment confirming a Chapter 13 plan as proposed in good faith.

The panel held that Congress's adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act forecloses a court's consideration of a debtor's Social Security income or a debtor's payments to secured creditors as part of the inquiry into good faith under 11 U.S.C. § 1325(a).

---

### COUNSEL

Robert G. Drummond, Great Falls, Montana, for Appellant/Trustee.

---

[*] The Honorable Kenneth F. Ripple, Senior Circuit Judge for the U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Edward A. Murphy, Murphy Law Offices, PLLC, Missoula, Montana, for Appellees/Debtors.

Tara Twomey, National Consumer Bankruptcy Rights Center, San Jose, California, for amicus curiae.

**OPINION**

RIPPLE, Senior Circuit Judge:

David and Sharon Welsh filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the District of Montana. The Trustee objected to the Welshes' proposed plan on the ground that it was not proposed in good faith. The bankruptcy court overruled the objection, and the Trustee appealed to the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP"). A divided panel of the BAP affirmed the decision of the bankruptcy court. Again the Trustee appealed, and we now affirm.

**BACKGROUND**

The Welshes filed a voluntary Chapter 13 petition on May 27, 2010. Their required schedules revealed the following assets: a home in Missoula, Montana, valued at $400,000, encumbered by a secured claim of $330,593.66; a Ford F-250 valued at $10,000, encumbered by a secured claim of $18,959; a 2006 Subaru Outback valued at of $9,500, encumbered by a secured claim of $12,211; a 2005 Toyota Matrix valued at $2,200, encumbered by a secured claim of $1,996; a 2005 Airstream trailer valued at $23,000, encumbered by a secured claim of $39,000; and two 2007 Honda ATVs each valued at $2,700, encumbered by secured

claims of $3,065 and $4,500. In addition to their secured debts, the schedules revealed unsecured claims totaling approximately $180,500, the largest of which were their daughter's student loan debt in the amount of $60,000 and a joint debt owed to Bank of America on a line of credit in the amount of $50,000.

Mrs. Welsh is employed as a nurse and reported on Schedule I a monthly income of $6,975.40. She also draws a pension of $1,100 per month. Mr. Welsh is retired, but listed a monthly income of $358.03 from wages, salary and commissions, as well as Social Security income in the amount of $1,165.

Because their income exceeds the median for the state of Montana, the debtors calculated their disposable income according to the "means test." On Form 22C,[1] they listed their current monthly income as $8,116.31; their current monthly income did not include Mr. Welsh's Social Security income of $1,165 because Social Security income is excluded from the current monthly income calculation.[2] After deducting future payments on secured claims, the debtors were left with a disposable income of $218.12 per month.[3]

The Welshes proposed a plan that provided for payments of $125 per month to unsecured creditors for the first thirty

---

[1] See ER 116 ("CHAPTER 13 STATEMENT OF CURRENT MONTHLY INCOME AND CALCULATION OF COMMITMENT PERIOD AND DISPOSABLE INCOME").

[2] See id. at 117 ("**Income from all other sources**. . . . **Do not include** any benefits received under the Social Security Act . . . .").

[3] See id. at 122.

months of the plan. After their vehicle loans were paid, the payments would increase to $500 per month for the last thirty months of the plan. The proposed plan would pay off approximately $14,700[4] of the debtors' $180,500 unsecured debt.

The Trustee objected on the ground that the debtors had not proposed their plan in good faith, a requirement for confirming the plan under 11 U.S.C. § 1325(a)(3), because of the "minuscule" payments to unsecured claims while they were living in a $400,000 home, making payments on various luxury and unnecessary items and failing to commit one hundred percent of their disposable income to the plan.[5]

In its decision, the bankruptcy court noted that it "reviews the totality of the circumstances to determine whether a plan has been proposed in good faith."[6] The bankruptcy court observed that, in *Leavitt v. Soto* (*In re Leavitt*), 171 F.3d 1219 (9th Cir. 1999), we had looked to four factors to determine whether a plan had been proposed in good faith: "(1) whether debtors misrepresented facts in their plan or unfairly manipulated the [Bankruptcy] Code, (2) the debtors' history of filings and dismissals, (3) whether the debtors intended to defeat state court litigation, and (4) whether egregious behavior is present."[7] The bankruptcy court observed that

---

[4] *See id.* at 125.

[5] *See id.* at 114–15. The Trustee also objected to the plan on other grounds, but does not pursue those grounds in the present appeal.

[6] *In re Welsh*, 440 B.R. 836, 847 (Bankr. D. Mont. 2010).

[7] *Id.* (citing *Leavitt v. Soto* (*In re Leavitt*), 171 F.3d 1219, 1224–25 (9th Cir. 1999)).

there was no evidence of the first three factors and that the case before it was distinguishable from those in which it had found egregious behavior.

> Egregious behavior supporting a finding of bad faith [in] *In re Opper*, 20 Mont. B.R. 123, 132 (Bankr. D. Mont. 2002), consisted of debtors proposing $0 to unsecured creditors while making payments to secured creditors to retain luxury items such as a boat and snowmobile, repaying a loan to a 401(k) plan, and failure to list assets. *Opper*, 20 Mont. B.R. at 132.
>
> The facts shown by the record in the instant case are not comparable to *Opper*. Debtors' Plan proposes $14,700 in payments to unsecured creditors. Their ATV's [sic] are not a luxury, since at least one is required for Sharon to plow her driveway in the winter in order to reach her home. David is the owner of the Toyota, on which they make payments but let their daughter use, and the secured creditor filed a claim in this case which has been allowed without objection showing David is the borrower. Their retention of the Airstream, by itself, is not enough to find egregious conduct.[**8**]

The court also believed that the Trustee's good faith objection "ignore[d] the fact that payments to secured claims are authorized in the means test at 11 U.S.C. § 707(b)(2)(A)(i)

---

[**8**] *Id.* at 848 (footnote omitted).

and (iii).'"⁹  Second-guessing payments to secured creditors, the bankruptcy court continued, would run afoul of precedent which held that "where a debtor is current on a secured obligation that is provided for in Form 22C, the Court refrains from determining whether the expense is reasonable."¹⁰

The bankruptcy court also rejected the Trustee's argument that the plan was not proposed in good faith because it failed to utilize any of Mr. Welsh's Social Security income.  The bankruptcy court observed that 42 U.S.C. § 407(a) protects Social Security income from "the operation of any bankruptcy or insolvency law"; according to the bankruptcy court, considering Social Security income in the good faith analysis would water down this protection.  Moreover, the fact that Social Security income was excluded from the definition of current monthly income under the means test reinforced this conclusion.  Therefore, the Welshes "ha[d] satisfied their burden of proof to show that they proposed their Plan in good faith."¹¹

A divided panel of the BAP affirmed the bankruptcy court's judgment.  The BAP framed the issue accordingly:

> The issue is whether, in determining whether a debtor has filed a chapter 13 plan in good faith, the court may take into consideration the debtors' failure to include income for plan payments that the Code

---

⁹ *Id.*

¹⁰ *Id.*

¹¹ *Id.* at 850.

specifically excludes from current monthly income, and the debtors' deduction of expenses that are expressly allowed by the Code in calculating disposable income. In other words, if the debtor has properly calculated projected disposable income and so meets the minimum payment amount under § 1325(b)(1)(B), can items used in that calculation be the basis for a finding that the plan was not proposed in good faith.[12]

In answering this question, the BAP noted that "[t]he Bankruptcy Code does not define 'good faith.'"[13] The BAP further observed, however, that, in *Goeb v. Heid* (*In re Goeb*), 675 F.2d 1386 (9th Cir. 1982), we had determined that "[t]he 'good faith' inquiry" was dependent on "whether the debtors [had] 'acted equitably in proposing their Chapter 13 plan,'" which, in turn, depended on "'whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner.'"[14] Although "'the substantiality of the proposed repayment'" was one consideration, "ultimately the good faith determination must take into account 'all militating factors.'"[15]

---

[12] *Drummond v. Welsh* (*In re Welsh*), 465 B.R. 843, 852 (B.A.P. 9th Cir. 2012).

[13] *Id.*

[14] *Id.* at 852–53 (quoting *Goeb v. Heid* (*In re Goeb*), 675 F.2d 1386, 1390 (9th Cir. 1982)).

[15] *Id.* at 853 (quoting *In re Goeb*, 675 F.2d at 1390).

The BAP noted that amendments to the Bankruptcy Code in 1984 and 2005 had not changed the requirement that a plan be proposed in good faith. Nevertheless, Congress had enacted specific substantive requirements for plan confirmation that addressed considerations which previously had been encompassed by the good faith inquiry. Therefore, in the BAP's view, courts no longer needed to consider whether particular types of income were available to pay creditors and whether proposed payments to creditors were sufficient because Congress explicitly had defined "disposable income"[16] and required that disposable income be used for the satisfaction of creditors. Therefore, according to the BAP:

> [T]aking advantage of a provision of the Code, such as calculating disposable income under the test explicitly set out in the Code, is not an indication of lack of good faith. Thus, we reject those cases that allow a court to take into consideration an above-median-income debtor's exclusion of income or deduction of expenses that are allowed by the means test formula in determining whether a debtor has proposed the plan in good faith.

> Section 1325(a)(3) still plays a role, and the court must take into consideration the totality of the circumstances, based on the factors the Ninth Circuit has articulated for determining good faith. If, in proposing a plan, the debtor has misrepresented facts, unfairly manipulated the Code, or engaged in

---

[16] *See* 11 U.S.C. § 1325(b)(2).

> egregious behavior, a court may find that the
> plan was not proposed in good faith. That
> finding may not, however, be based on the
> mere fact that the debtor has excluded income
> or deducted expenses that the Code allows.[17]

The BAP then observed that "[t]he same analysis applie[d] to
consideration of a debtor's exclusion of Social Security
income in calculating disposable income."[18] The BAP
observed that, not only is Social Security income
"specifically excluded from the disposable income
calculation for chapter 13 debtors,"[19] but 42 U.S.C. § 407 also
contains an explicit prohibition that Social Security income
not be "subject to . . . the operation of any bankruptcy or
insolvency law." The BAP concluded that the debtors'
exclusion of Social Security income from the disposable
income calculation, therefore, is not, "by itself, probative of
a lack of good faith," and it

> reject[ed] the reasoning of the cases that say
> that, because Social Security payments are
> intended to provide for a recipient's basic
> needs, a debtor must use the benefit payments
> to provide for those basic needs, thereby
> freeing up other, non-exempt income, for plan
> payments. *E.g., In re Hall*, 442 B.R. 754
> (Bankr. D. Idaho 2010). This approach
> simply does by indirection what the Code says

---

[17] *In re Welsh*, 465 B.R. at 854–55 (footnote omitted).

[18] *Id.* at 855.

[19] *Id.*

cannot be done, which is to include Social
Security benefit payments in a debtor's
disposable income calculation.[20]

The BAP therefore affirmed the bankruptcy court's order
confirming the Welshes' plan.

Judge Pappas dissented. He believed that "the bankruptcy
court did not engage in the sort of unfettered 'totality of the
circumstances' review mandated by *In re Goeb*. Instead, the
bankruptcy court applied a 'not-quite totality of the
circumstances' test, and decided it should not consider two
highly relevant factors about Debtors' plan. That was
error."[21] Judge Pappas first opined that it was not violative of
the Social Security prohibition to consider those payments in
the good faith analysis. He observed that

the fact that a debtor receives Social Security
income is considered all the time, for many
different purposes, in chapter 13 cases. For
example, a debtor's monthly Social Security
payments can provide the basis for a
bankruptcy court to find that a debtor has
"regular income" to be eligible for chapter 13
relief in the first place.[22]

Moreover, "[w]hile a debtor's projected disposable income as
calculated under § 1325(b)(2) sets a *floor* for chapter 13 plan

---

[20] *Id.* at 856.

[21] *Id.* at 859 (Pappas, J., dissenting).

[22] *Id.*

payments, these calculations do not constitute a safe harbor, nor dictate whether a debtor could comfortably be paying more to creditors in a particular case."[23]    Judge Pappas therefore concluded:

> Like the many other bankruptcy courts that have done so, this Panel should hold that Social Security income is a relevant factor for the bankruptcy court to consider in evaluating a debtor's good faith under a [sic] § 1325(a)(3).  If Congress wanted bankruptcy courts to exclude consideration of Social Security benefits under § 1325(a)(3), it could have easily done so expressly, as it did in § 101(10A).  It did not, and we should not strain to imply that restriction in reading other, inapplicable statutes.  In this case, when the bankruptcy court held that it was constrained from considering Debtor's Social Security payments, it erred.[24]

Judge Pappas also took issue with the bankruptcy court's conclusion that it could not consider payments made to secured creditors in the good faith calculus.  According to Judge Pappas, "that current payments to secured creditors are deducted in a § 707(b)(2)/§ 1325(b) means test analysis is not reason enough for the bankruptcy court to decline to exercise its conscience in deciding whether, in proposing large plan payments on unnecessary secured debts, the plan treats

---

[23] *Id.* at 860.

[24] *Id.*

Debtors' other creditors equitably."[25]   "Here," explained Judge Pappas,

> Debtors should reasonably be expected to propose a chapter 13 plan that retains, and pays the debts secured by, their home and necessary vehicles.  But there is nothing in the record to demonstrate that Debtors needed, or that they should pay the debts for, a car their nonresident, physician-daughter drives, two four-wheeler ATVs, or an Airstream travel trailer.[26]

Judge Pappas concluded:

> While it may be an amorphous, somewhat subjective standard, at bottom, § 1325(a)(3) is designed to prevent confirmation of inequitable plans.  A bankruptcy court simply cannot decide if a plan is proposed in good faith if it declines to consider either that a debtor receives Social Security income, or the nature, amount and reasonableness of the debtor's proposed payments to secured creditors through a plan.  Because the bankruptcy court refused to consider such highly relevant facts as part of the totality of the circumstances in Debtors' case, it applied an incorrect legal analysis in examining Debtors' good faith, and abused its discretion

---

[25] *Id.* at 860–61.

[26] *Id.* at 861 (footnotes omitted).

in confirming Debtors' plan. The principles
of fairness embodied in § 1325(a)(3) require
that we vacate the order confirming the plan
and remand to the bankruptcy court to
perform a proper good faith analysis of
Debtors' plan.[27]

## DISCUSSION

In this appeal, the Trustee renews the arguments made to
the bankruptcy court and to the BAP. Specifically, he
maintains that, in determining whether the Welshes proposed
their Chapter 13 plan in good faith, the bankruptcy court
should have considered the amount that the Welshes were
paying to secured creditors for luxury items and also should
have considered Mr. Welsh's Social Security income.[28]

---

[27] *Id.* at 862–63.

[28] In this court, the Trustee does not argue—nor could he, *see infra* pp.
23–25—that, in calculating disposable income under § 1325(b), the
Welshes either should have included Social Security income among their
available income or should not have deducted their payments to secured
creditors. The issue is limited to whether these items, while properly
accounted for in the calculation of disposable income, nevertheless may
be considered as evidence that the plan was not proposed in good faith
under 11 U.S.C. § 1325(a)(3).

There has been a disagreement among the bankruptcy courts in this
circuit regarding whether, in light of Congress's recent amendments, the
good faith inquiry should continue to include consideration of either a
debtor's Social Security income or a debtor's use of funds to pay secured
debts. *Compare In re Welsh*, 440 B.R. at 849–50 (holding that neither the
debtors' failure to use their Social Security income for the benefit of
creditors nor their payments to secured creditors explicitly allowed by
11 U.S.C. § 707(b)(2)(A)(i) evidenced a lack of good faith), *with In re
Enabnit*, —B.R.—, 2013 WL 309909, at *4–5 (Bankr. N.D. Cal. Jan. 17,

Whether the BAP applied the correct legal standard in determining good faith is a question of law that we review de novo.[29]

## A.  The History of the Good Faith Requirement

We begin our consideration of the good faith requirement with the statutory language and the interpretation of that language over the years.  The good faith requirement of § 1325, which has been a part of the Bankruptcy Code since its enactment in 1978, provides:

> § 1325. Confirmation of plan
>
> (a) Except as provided in subsection (b), the court shall confirm a plan if--
>
> > (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
> >
> > (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

---

2013) (disagreeing with *In re Welsh* that the nature of secured debts may not be considered in assessing good faith under § 1325(a)(3)).

[29] *See In re Love*, 957 F.2d 1350, 1354 (7th Cir. 1992) ("The lower courts' conclusions with regard to the legal standard applicable to good faith determinations are questions of law reviewed under the *de novo* standard."); *Anderson v. Cranmer* (*In re Cranmer*), 697 F.3d 1314, 1316 (10th Cir. 2012) ("Whether a court may consider [Social Security income] in the good faith analysis is also a question of law reviewed de novo.").

(3) *the plan has been proposed in good faith* and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date; . . . .

11 U.S.C. § 1325(a) (2006) (emphasis added). Shortly after its enactment, we considered the meaning of the "good faith" requirement in *In re Goeb*, 675 F.2d 1386. In that case, the debtors had proposed a plan that provided payments to unsecured creditors at a rate of one cent on the dollar. The bankruptcy court found that the debtors had "not intend[ed] to substantially repay their unsecured debts," and, therefore, the plan was not proposed in good faith.[30] On appeal, we observed that Congress had not defined "'good faith,'" and, "[a]bsent some compelling reason" for doing so, we were hesitant to infer an inflexible, blanket rule that required substantial repayment to unsecured creditors in all cases.[31] Congress, we noted, had set forth a minimum repayment

---

[30] *In re Goeb*, 675 F.2d at 1387.

[31] *Id*. at 1388.

level,[32] and "[t]he presence of an explicit statutory standard
. . . strongly suggests that Congress did not intend to
substitute a more rigorous standard when it imposed a general
good-faith requirement."[33]  Moreover, Congress was aware
that courts had come to different conclusions on the question
whether substantial repayment was required.  We therefore

> decline[d] to impose a substantial-repayment
> requirement because (1) it is contrary to the
> language of the statute, (2) whether it would
> best further the purposes of the Bankruptcy
> Code is uncertain, and (3) Congress is aware
> of the perceived deficiency in § 1325(a).
> Rather than set a rigid standard under the
> guise of interpreting "good faith," we
> deem[ed] it advisable to apply the law as
> written and wait for Congress to create, if it
> chooses, further conditions for the
> confirmation of Chapter 13 plans.[34]

We then focused on the task of defining good faith.  In
doing so, we were "impeded not only by it[s] being an
ambiguous term that resists precise definition in any case, but
also by the lack of authoritative guidance on its meaning in

---

[32] As it does now, 11 U.S.C. § 1325(a)(4) "require[d] that the amount to
be paid on each unsecured claim cannot be 'less than the amount that
would be paid on such claim if the estate of the debtor were liquidated
under Chapter 7.'"  *In re Goeb*, 675 F.2d at 1388.

[33] *In re Goeb*, 675 F.2d at 1388.

[34] *Id.* at 1389.

§ 1325(a)(3)."[35]    We "f[ou]nd instructive" the Supreme Court's discussion of good faith in *American United Mutual Life Insurance Co. v. City of Avon Park*, 311 U.S. 138 (1940), in which the Court had "focused on '[e]quity and good conscience' in finding that the acceptance [of a bankruptcy plan] had not been made in good faith."[36]    Following that lead, we concluded that "the proper inquiry is whether the Goebs acted equitably in proposing their Chapter 13 plan" and that this inquiry should focus on "whether the debtor ha[d] misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner."[37]    We added that, "[t]hough it may consider the substantiality of the proposed repayment, the court must make its good-faith determination in the light of *all* militating factors."[38]    This inquiry was "quite broad,"[39] and, consequently, we did not "attempt . . . to compile a complete list of relevant considerations"; instead, we instructed that "bankruptcy courts should determine a debtor's good faith on a case-by-case basis, taking into account the particular features of each Chapter 13 plan."[40]

    In 1984, Congress amended Chapter 13 to address perceived abuses in the bankruptcy process.  Most pertinent

---

[35] *Id.* at 1389–90.

[36] *Id.* at 1390 (second alteration in original).

[37] *Id.*

[38] *Id.* (emphasis added).

[39] *Id.* n.9.

[40] *Id.* at 1390.

to the issues currently before us was the concern that, as in *In re Goeb*, debtors were proposing plans that provided for minimal repayment of unsecured creditors, while the debtors maintained excess income that could have been devoted to those debts.[41]  The 1984 amendments, therefore, added a projected disposable income requirement:  An objection by the trustee or an unsecured creditor triggered a requirement that the debtor devote all of his disposable income for three years to make payments under the plan.[42]  Section 1325(b) defined "disposable income" as "income which is received by the debtor and which is not reasonably necessary to be expended" either "for the maintenance or support of the debtor or a dependent" or for the continuation of a going business.[43]

The changes in the Bankruptcy Code did not require our reconsideration of the "totality of the circumstances" test as

---

[41] *See, e.g.*, *Deans v. O'Donnell* (*In re Deans*), 692 F.2d 968, 972 (4th Cir. 1982) ("[R]epayment to unsecured creditors, although not a requirement for confirmation of every Chapter 13 plan, was one intended purpose of Chapter 13's enactment.  Failure to provide substantial repayment is certainly evidence that a debtor is attempting to manipulate the statute rather than attempting honestly to repay his debts.").

[42] *See* 11 U.S.C. § 1325(b) (1988) ("(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan— . . . (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.").

[43] *See id.* § 1325(b)(2) (1988).

a measure of good faith,[44] and we continued to employ that formulation.[45] Nevertheless, they did raise questions about the breadth of the "good faith" inquiry. The 1984

---

[44] *See In re Smith*, 848 F.2d 813, 819 (7th Cir. 1988) (noting that, in enacting the 1984 amendments, "Congress demonstrated no specific intent to change the prevailing 'totality of the circumstances' test").

[45] *See, e.g.*, *In re Leavitt*, 171 F.3d at 1224. *In re Leavitt* concerned "the appropriate standard of bad faith as 'cause' to dismiss a Chapter 13 bankruptcy petition with prejudice." *Id.* at 1220 (footnote omitted). We held that "[b]ad faith, as cause for the dismissal of a Chapter 13 petition with prejudice, involves the application of the 'totality of the circumstances' test." *Id.* at 1224. In determining whether a petition was filed in bad faith, we instructed that the following factors should be considered:

> (1) whether the debtor "misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner," [*Eisen v. Curry* (*In re Eisen*), 14 F.3d 469, 470 (9th Cir. 1994) (per curiam)] (citing *In re Goeb*, 675 F.2d 1386, 1391 (9th Cir. 1982));
>
> (2) "the debtor's history of filings and dismissals," *id.* (citing *In re Nash*, 765 F.2d 1410, 1415 (9th Cir. 1985));
>
> (3) whether "the debtor only intended to defeat state court litigation," *id.* (citing *In re Chinichian*, 784 F.2d 1440, 1445-46 (9th Cir. 1986)); and
>
> (4) whether egregious behavior is present, *[In re] Tomlin*, 105 F.3d [933,] 937 [(4th Cir. 1997)]; *In re Bradley*, 38 B.R. 425, 432 (Bankr. C.D. Cal. 1984).

*In re Leavitt*, 171 F.3d at 1224 (first, second and third alterations in original).

amendments included statutory language that directly addressed matters, such as how much a debtor had to pay under a plan, that previously had been subsumed in the "good faith" inquiry. Once Congress explicitly addressed those issues, a number of courts and commentators concluded that there was no need to consider them as part of the inquiry into good faith.[46]

In 2005, Congress again revised Chapter 13 when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). The good faith requirement under § 1325(a) remained the same, but there were significant changes with respect to the calculation of disposable income. Before the BAPCPA, bankruptcy judges had authority to determine a debtor's ability to pay based on the individual circumstances of each case and each debtor.[47]  Congress

---

[46] *See, e.g.*, *In re Smith*, 848 F.2d at 820 (observing that the totality of the circumstances test "has been narrowed only by the few specific provisions of [the amendments] which now cover situations which previously fell within the [totality of the circumstances] analysis"); *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987) (observing that the 1984 addition of "'ability to pay' criteria subsumes most of the [totality of the circumstances] factors and allows the court to confirm a plan in which the debtor uses all of his disposable income for three years to make payments to his creditors" and that, therefore, the "inquiry into whether the plan 'constitutes an abuse of the provisions, purpose or spirit of Chapter 13,' has a more narrow focus" (citation omitted)); 8 *Collier on Bankruptcy* ¶ 1325.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) ("Because Congress dealt with the issue quite specifically in the ability-to-pay provisions, there is no longer any reason for the amount of a debtor's payments to be considered as even a part of the good faith standard." (footnote omitted)).

[47] *See, e.g.*, *In re Awuku*, 248 B.R. 21, 29 (Bankr. E.D.N.Y. 2000) ("In determining what is a reasonably necessary expense, Congress could have not been clearer in stating its unmistakable intention that the bankruptcy

replaced this discretion with a detailed, mechanical means test,[48] which requires debtors with above-median income to calculate their "disposable income" by subtracting specific expenses from "current monthly income," as defined by the Bankruptcy Code.[49]  For our purposes, several elements of this calculation are important.  The debtor begins with his "current monthly income," which, by definition, explicitly "excludes benefits received under the Social Security Act."[50] The debtor then subtracts living expenses[51] based on the Internal Revenue Service's "Collection Financial Standards," a detailed series of averages for living expenses that the Service uses to calculate necessary expenditures for delinquent taxpayers.[52]  The debtor also subtracts his averaged payments to secured creditors due during the following sixty months.[53]

---

judges have authority to exercise their sound discretion in applying a very broad and open-ended standard.").

[48] *Coop v. Frederickson* (*In re Frederickson*), 545 F.3d 652, 658 (8th Cir. 2008) ("In enacting BAPCPA, Congress reduced the amount of discretion that bankruptcy courts previously had over the calculation of an above-median debtor's income and expenses.").

[49] *See* 11 U.S.C. § 1325(b)(2)–(3) (2006).

[50] 11 U.S.C. § 101(10A)(B) (2006).

[51] *Id.* § 707(b)(2)(A)(ii).

[52] *See* Charles J. Tabb & Jillian K. McClelland, *Living with the Means Test*, 31 S. Ill. U. L.J. 463, 477–78 (2007).

[53] 11 U.S.C. § 707(b)(2)(A)(iii)(I) (2006).

As is the case here, the manner in which the means test calculates "disposable income" may underestimate the amount of *actual* funds that a taxpayer has available to pay unsecured creditors. A debtor who receives Social Security income or support payments for dependent children does not have to account for that income when calculating "disposable income" according to the means test. Moreover, on the expense side, the means test allows for the deduction of secured debts without regard for the nature of the collateral. The result may be that, consistent with the means test, the debtors could make secured payments on luxury or comfort items, such as ATVs and motor homes, with the result that little "disposable income," as that figure is calculated, remains to pay unsecured creditors.

The disparity between a debtor's actual disposable funds and "disposable income," as defined in Chapter 13, as well as the apparent priority given to secured creditors has "renewed the debate over ability to pay as a good faith factor."[54] As in the present case, trustees and unsecured creditors have challenged debtors' proposed plans as lacking good faith when the debtor retains Social Security income or proposes to continue making payments on expensive homes, cars or other items, to the detriment of unsecured creditors. We turn first to the issue of Social Security income.

## B. Consideration of Social Security Income in the Good Faith Analysis

The Trustee maintains that the good faith inquiry requires us to consider whether an above-median-income debtor is

---

[54] Hon. W. Homer Drake, Hon. Paul W. Bonapfel & Adam M. Goodman, *Chapter 13 Practice & Procedure* § 9B:33, at 802 (2012).

using all his available income for the payment of his creditors, regardless whether that income is part of the "disposable income" calculation. Here, the Trustee maintains that the Welshes' failure to devote Mr. Welsh's Social Security income to the payment of unsecured creditors shows a lack of good faith. We cannot reconcile this concept of good faith with the statutory language.

As we have set forth in some detail, in enacting the BAPCPA, Congress made a conscious effort to cabin the discretion of bankruptcy judges in assessing disposable income.[55]  Congress replaced a case-by-case analysis of disposable income with a rigid, mechanical means test. The calculation of "disposable income" now incorporates the definition of "current monthly income," and the definition of "current monthly income" excludes Social Security income. Because "[p]rior to BAPCPA, courts typically included Social Security benefits in the calculation of disposable income," *Baud v. Carroll*, 634 F.3d 327, 347 (6th Cir. 2011) (collecting cases), *cert. denied*, 132 S. Ct. 997 (2012), we agree with the Sixth Circuit that this new approach to disposable income is a "'clear indication that Congress intended . . . a departure' from any such pre-BAPCPA practice," *id.* (alteration in original) (quoting *Hamilton v. Lanning*, 130 S. Ct. 2464, 2473 (2010)).

Here, the Trustee does not contend, of course, that the calculation of disposable income should have incorporated Social Security income; the statutory language is clearly to the contrary. Instead, he concedes that disposable income was calculated correctly under the BAPCPA, but nevertheless maintains that the Welshes' failure to dedicate Mr. Welsh's

---

[55] *See supra* notes 47–53, and accompanying text.

Social Security income to the payment of unsecured creditors requires a conclusion that the plan was not proposed in good faith, as required by § 1325(a)(3). We cannot conclude, however, that a plan prepared completely in accordance with the very detailed calculations that Congress set forth is not proposed in good faith. To hold otherwise would be to allow the bankruptcy court to substitute its judgment of how much and what kind of income should be dedicated to the payment of unsecured creditors for the judgment of Congress. Such an approach would not only flout the express language of Congress, but also one of Congress's purposes in enacting the BAPCPA, namely to "reduce[] the amount of discretion that bankruptcy courts previously had over the calculation of an above-median debtor's income and expenses." *Coop v. Frederickson* (*In re Frederickson*), 545 F.3d 652, 658 (8th Cir. 2008).

We previously have eschewed establishing "rigid" repayment requirements "under the guise of interpreting 'good faith,'" on the recognition that Congress could enact, "if it chooses, further conditions for the confirmation of Chapter 13 plans." *In re Goeb*, 675 F.2d at 1389. Just as we cannot add to what Congress has enacted "under the guise of interpreting 'good faith,'" so too we cannot ignore the explicit repayment requirements that Congress has chosen to enact. When Congress speaks directly to one of the good faith factors, the judicial good faith inquiry is narrowed accordingly. *See, e.g.*, *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987) (noting that § 1325(b)'s "'ability to pay' criteria subsume[d] most" of the factors under the totality of the circumstances test). Congress has spoken directly, and it explicitly excluded Social Security

income from the calculation of disposable income.  We thus join every court of appeals that has decided the issue in concluding that, "[w]hen a Chapter 13 debtor calculates his repayment plan payments exactly as the Bankruptcy Code and the Social Security Act allow him to, and thereby excludes [Social Security income], that exclusion cannot constitute a lack of good faith." *Anderson v. Cranmer* (*In re Cranmer*), 697 F.3d 1314, 1319 (10th Cir. 2012); *see also Beaulieu v. Ragos* (*In re Ragos*), 700 F.3d 220, 227 (5th Cir. 2012) ("Having already concluded that Debtors' plan fully complied with the Bankruptcy Code, it is apparent that Debtors are not in bad faith merely for doing what the Code permits them to do."); *cf. Fink v. Thompson* (*In re Thompson*), 439 B.R. 140, 144 (B.A.P. 8th Cir. 2010) ("Standing alone, the Debtors' retention of Social Security income is insufficient to warrant a finding of bad faith under § 1325(a)(3)." (internal quotation marks omitted)).[56]

---

[56] The Welshes argue in the alternative that, even if Congress's adoption of the means test did not preclude courts from considering debtors' retention of Social Security income in assessing good faith, such consideration nevertheless would be prohibited by 42 U.S.C. § 407; that section provides in relevant part:

> (a) In general
>
> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter *shall be subject . . . to the operation of any bankruptcy or insolvency law*.
>
> (b) Amendment of section
>
> No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit,

The Trustee maintains, however, that the good faith requirement, located in § 1325(a), should not be read in light of the disposable income calculation, located in § 1325(b). The Trustee explains that the Bankruptcy Code "'initially' mandates 'good faith.' Once past this threshold," the Trustee reasons, "the debtor may proceed to confirmation unless a creditor objects."[57] The Trustee urges us to "determine that the good faith test and the disposable income test serve two different purposes," and, therefore, "they must be read separately."[58]

We agree with the Trustee's contentions, but disagree that it leads to the conclusion that the good faith inquiry can encompass considerations of what income, and how much income, a debtor is devoting to the proposed plan. As we set forth in *In re Leavitt*, 171 F.3d at 1224, our good faith analysis includes whether: (1) the debtor has misrepresented the facts, manipulated the Bankruptcy Code or filed in an inequitable manner; (2) the debtor's history of bankruptcy filings; (3) the debtor intended to frustrate collection of a state-court judgment; and (4) "egregious behavior is present."

---

supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section.

42 U.S.C. § 407(a)–(b) (2006) (emphasis added). Because we conclude that Congress's adoption of the means test precludes us from considering, as part of our good faith inquiry, a debtor's retention of Social Security income, we have no occasion to decide whether such consideration would violate § 407's prohibition.

[57] Appellant's Br. 7.

[58] *Id.* at 8.

In sum, the inquiry focuses on the debtor's motivation and forthrightness with the court in seeking relief. The disposable income requirement, in contrast, focuses on the amount of funds that Congress expects a debtor to devote to paying off unsecured creditors. These two inquiries are, indeed, separate and distinct. Therefore, consideration of disposable income—now defined in great detail by Congress—has no role in the good faith analysis.

The Trustee further submits that the approach that we adopt today frustrates the policy undergirding the BAPCPA: "to help ensure that debtors who *can* pay creditors *do* pay them." *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 721 (2011). The mechanism by which Congress chose to effectuate this policy, however, is the means test. *See id.* (describing the means test as being at "the heart of BAPCPA's consumer bankruptcy reforms" (brackets omitted) (internal quotation marks omitted)). Moreover, as we have observed in another context,

> [l]egislation often results from a delicate compromise among competing interests and concerns. If we were to "fully effectuate" what we take to be the underlying policy of the legislation, without careful attention to the qualifying words in the statute, then we would be overturning the nuanced compromise in the legislation, and substituting our own cruder, less responsive mandate for the law that was actually passed.

*Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1113 (9th Cir. 2000). We therefore decline to give greater weight to one of the purposes of the BAPCPA by ignoring the explicit language that Congress enacted.

## C. Consideration of Payments to Secured Creditors in the Good Faith Analysis

The Trustee also maintains that, in determining whether the Welshes proposed their plan in good faith, the bankruptcy court should have considered the Welshes' payments to secured creditors with respect to "luxury" items. Specifically, the Trustee believes that a plan that allows the Welshes to continue to make payments on loans secured by these items, while paying relatively little to unsecured creditors, is not one proposed in good faith. Again, we conclude that the Trustee's argument is foreclosed by the disposable income calculation mandated by the BAPCPA.

Section 1325 states that disposable income is current monthly income "less amounts reasonably necessary to be expended— . . . for the maintenance or support of the debtor or a dependent of a debtor." 11 U.S.C. § 1325(b)(2) (2006).[59]

---

[59] 11 U.S.C. § 1325(b) further provides in relevant part:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--

> . . .

> (B) the plan provides that all of the debtor's projected disposable income to be received in the

applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended--

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

(3) Amounts reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than--

Section 1325 further provides that "[a]mounts reasonably necessary to be expended under paragraph (2) . . . *shall be determined* in accordance with subparagraphs (A) and (B) of section 707(b)(2)."    11 U.S.C. § 1325(b)(3) (emphasis added).  For its part, section 707(b)(2) provides that current monthly income shall be reduced by "[t]he debtor's average monthly payments on account of secured debts,"  11 U.S.C. § 707(b)(2)(A)(iii); that section, however, does not include any qualification or limitation on the kind of secured debt that is deducted from current monthly income.[60]    As we

---

(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $625 per month for each individual in excess of 4.

11 U.S.C. § 1325(b)(1)–(3) (2006 & Supp. V 2012).

[60] 11 U.S.C. § 707(b)(2)(A)(iii) (2006 & Supp. V 2012) provides:

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of--

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and

recognized in *Maney v. Kagenveama* (*In re Kagenveama*),
541 F.3d 868, 873 n.2 (9th Cir. 2008), *overruled on other
grounds by Hamilton v. Lanning*, 130 S. Ct. 2464, 2475
(2010), prior to the BAPCPA,

> [d]etermining what was "reasonably
> necessary" for the maintenance or support of
> the debtor was dependent on each debtor's
> individual facts and circumstances. This
> amorphous standard produced determinations
> of a debtor's "disposable income" that varied
> widely among debtors in similar
> circumstances. BAPCPA replaced the old
> definition of what was "reasonably necessary"
> with a formulaic approach for above-median
> debtors. 11 U.S.C. § 1325(b)(3).

Again, in the BAPCPA, Congress chose to remove from the
bankruptcy court's discretion the determination of what is or
is not "reasonably necessary."[61]  It substituted a calculation

---

> (II) any additional payments to secured
> creditors necessary for the debtor, in filing a plan
> under chapter 13 of this title, to maintain
> possession of the debtor's primary residence,
> motor vehicle, or other property necessary for the
> support of the debtor and the debtor's dependents,
> that serves as collateral for secured debts;

> divided by 60.

[61] *See Baud v. Carroll*, 634 F.3d 327, 348 (6th Cir. 2011) (observing
that, "[p]rior to BAPCPA, bankruptcy courts had the discretion to
determine whether debtors' mortgage expenses were reasonably
necessary" and "that § 1325(b)(3) provides a clear indication that
Congress intended a departure from such pre-BAPCPA practice").

that allows debtors to deduct payments on secured debts in determining disposable income. That policy choice may seem unpalatable either to some judges or to unsecured creditors. Nevertheless, that is the explicit choice that Congress has made. We are not at liberty to overrule that choice.

The Trustee maintains, however, that "Congress did not adopt a policy to prefer secured creditors over unsecured creditors."[62] He points to the Supreme Court's statement in *Ransom*, 131 S. Ct. at 730, that "Congress did not express a preference for one use of these funds over the other," in support of his contention. Read in context, *Ransom* does not support the Trustee's position. *Ransom* addressed the issue whether a debtor "who owns his car outright, and so does not make loan or lease payments, may claim an allowance for car-ownership costs" under the means test.[63] The Court determined that the debtor could not. In doing so, it rejected the debtor's argument that "denying the ownership allowance to debtors in his position sends entirely the wrong message, namely, that it is advantageous to be deeply in debt on motor vehicle loans, rather than to pay them off."[64] The Court reasoned:

> [T]he choice here is not between thrifty savers and profligate borrowers, as Ransom would have it. Money is fungible: *The $14,000 that Ransom spent to purchase his Camry outright*

---

[62] Appellant's Br. 14.

[63] *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 721 (2011).

[64] *Id.* at 729 (internal quotation marks omitted).

> *was money he did not devote to paying down his credit card debt, and Congress did not express a preference for one use of these funds over the other.* Further, Ransom's argument mistakes what the deductions in the means test are meant to accomplish. Rather than effecting any broad federal policy as to saving or borrowing, the deductions serve merely to ensure that debtors in bankruptcy can afford essential items. The car-ownership allowance thus safeguards a debtor's ability to retain a car throughout the plan period. If the debtor already owns a car outright, he has no need for this protection.[65]

Therefore, when the Court made the statement upon which the Trustee relies, it was addressing a debtor's use of funds pre-bankruptcy, not whether Congress gave a priority to secured creditors after bankruptcy.

The calculation of "disposable income" under the BAPCPA requires debtors to subtract their payments to secured creditors from their current monthly income. In enacting the BAPCPA, Congress did not see fit to limit or qualify the kinds of secured payments that are subtracted from current monthly income to reach a disposable income figure. Given the very detailed means test that Congress adopted, we cannot conclude that this omission was the result of oversight. Moreover, even if it were, we would not be

---

[65] *Id.* at 729–30 (emphasis added).

justified in imposing such a limitation under "the guise of interpreting 'good faith.'"[66]

## Conclusion

We conclude that Congress's adoption of the BAPCPA forecloses a court's consideration of a debtor's Social Security income or a debtor's payments to secured creditors as part of the inquiry into good faith under 11 U.S.C. § 1325(a). We therefore affirm the judgment of the BAP.

**AFFIRMED.**

---

[66] *In re Goeb*, 675 F.2d at 1389.